HONORABLE JAMES L. ROBART

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

9
10
11
12
13
14
15
16
17

| | |
|---|---|
| JEFFREY SMYTH and BETTY SMYTH, husband and wife, and the marital community composed thereof,<br><br>            Plaintiffs,<br>   vs.<br><br>STATE FARM FIRE & CASUALTY CO., an Illinois corporation duly licensed in the State of Washington,<br><br>            Defendant. | NO.    2:05-cv-0838JLR<br><br>PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF DISMISSAL<br><br>**NOTED ON MOTION CALENDAR: October 7, 2005** |

## I. Introduction

18
19
20
21
22
23
24
25
26
27
28

Plaintiff Jeff Smyth,[1] a homeowner and insured, has sued his insurer defendant State Farm Fire & Casualty Co. ("State Farm") for declaratory and other relief arising from State Farm's failure to pay a claim for structural damage caused by hidden decay in Mr. Smyth's home on Mercer Island.  State Farm removed the case to this court and has now moved to dismiss all of the claims on the basis of a one year contractual limitations period.

---

[1]  Since this lawsuit was filed, the marriage of Jeff and Betty Smyth has been dissolved, and Mr. Smyth has purchased Mrs. Smyth's interest in their home.  As such, Mr. Smyth is now the sole plaintiff in this action.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 1
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

The motion should be denied for several reasons: (1) this action was filed within the contractual limitation period; (2) the filing of the lawsuit resulted in the negotiation of a tolling agreement which tolled the service time limit; (3) at best (for State Farm), the tolling agreement is ambiguous and should be construed against State Farm; and (4) material questions of fact exist with respect to (i) the date of loss or damage; and (ii) the type and extent of the insured's covered losses.

## II. Pertinent Factual Background

Jeff and Betty Smyth ("Smyth") built their home on Mercer Island in 1991. Declaration of Jeff Smyth in Opposition to Motion to Dismiss at ¶ 2 (dated Oct. 3, 2005)("Smyth Decl."). They have continuously insured the home with defendant State Farm from October 10, 1991 to the present, with no gaps in coverage. *Id.* Smyth consistently selected the broadest homeowners' coverage offered to him. *Id.* The cover page of the 1998-99 policy states: "*This is one of the broadest forms available today, and provides you with outstanding value for your insurance dollars.*" **Exh. J,** at POL000234, Declaration of Alvin Carlson (dated Sept. 10, 2005). Though they have seen their premiums rise steadily every year, all premiums (including for the current year) have been timely paid. Declaration of Jeff Smyth in Opposition to Motion to Dismiss ¶¶ 2-3 (dated Oct. 3, 2005)("Smyth Decl.").

In October 1998, State Farm attempted to limit Smyth's coverage by substantially eliminating coverage for hidden decay which causes "substantial structural impairment," leaving coverage only for actual structural "collapse," defined as "actually fallen down or fallen into pieces." Smyth was given no legally sufficient notice of this change in coverage

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 2
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA 98121
206-441-4110 (Tel)
206-441-4220 (Fax)

1  however.[2]  As such, the new definition of "collapse" is inapplicable to Smyth's policies up to the

2  present date, as is discussed in detail below.[3]

3

4  In the spring of 2003, Jeff Smyth confirmed through professional construction consultants

5  (employed at his own cost), that hidden decay due to water infiltration had caused substantial

6  structural impairment to his home, to the extent that one portion of the structure was visibly

7  sagging. Smyth Decl. at ¶ 4.  By the end of May 2003, Smyth's contractors estimated that the

8  damage was so extensive and dangerous that it could cost over $318,000.00 to repair.  Id.  After

9  hiring legal counsel, in August 2003 Smyth made a formal claim to State Farm.  Id. at ¶¶ 4-5.

10

11  State Farm initiated an investigation of the claim, and in September 2003 its consultant

12  generated a report observing that only a portion of the residence was in a state of "substantial

13  structural impairment" by or before October 1998, coincidentally the date on which State Farm

14  attempted to exclude coverage for that risk.  Exh. B, at CLM00067-77, Declaration of James R.

15  Perrault (dated July 26, 2005)(on file herein).  The majority of the identified structural impairment,

16  according to State Farm's report, did not occur until after 1998.  Id.

17

18  In a letter dated August 21, 2003, State Farm informed Smyth's legal counsel that "we have

19  identified several specific exclusions in your client's State Farm Homeowners policy which may

20  apply to preclude coverage for the loss."  Exh. C, at CLM000053(emphasis added), Carlson Decl.

21

22

23

24  [2] Footnote 5 of defendant's motion states incorrectly that Smyth was issued an "Amendatory Collapse
25  Endorsement (FP7955)" in 1998.  In fact, no such endorsement has ever been sent to Smyth.Smyth Decl. ¶ 13. The
   Declarations page of the 1998-1999 policy identifies that "The Loss Settlement Provisions of your policy have been
26  changed."  Nothing is said about "collapse." Exh. J, at POL000233, Carlson Decl.

27  [3] Smyth's annual premium did not decrease or remain steady to reflect this coverage limitation:  in fact,
   from policy year 1998 to policy year 1999, the annual premium increased nearly 50%, from $897.00 to $1,368.00,
28  even though the Smyths had not previously made a claim. Smyth Decl. ¶ 2.  Accordingly, the premium charged gave
   no clue of a coverage reduction.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 3
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

One of them was a nonexistent "Amendatory Collapse Endorsement." *Id.* No other exclusions are applicable to this claim.

When unsatisfactory progress was made in adjusting the claim, on February 23, 2004, Smyth started this lawsuit against State Farm in King County Superior Court (seven months after the claim date). <u>Declaration of Simeon Osborn in Opposition to Motion for Summary Judgment</u> (dated Oct. 3, 2005)("Osborn Decl."). On February 26, State Farm expressly acknowledged that it had been informed the complaint which Smyth had filed "in an abundance of caution." **Exh. F,** at CLM000018, <u>Carlson Decl.</u>

Days later, on March 2, 2004, a tolling agreement was drafted and signed by State Farm. *See* **Exh. G,** at CLM000033, <u>Carlson Decl.</u> State Farm's activity records acknowledged the agreement as follows:

> "We've entered into a tolling agreement with the insured to give us a chance to complete the investigation and determine what we owe. Need to talk with Jim P[errault] about the scope of repair, what's status of that."

**Exh. F,** at CLM000018, <u>Carlson Decl.</u> The tolling agreement extended the contractual limitation period from one year "after the date of loss or damage" to 18 months. The tolling agreement did not request or require that Smyth dismiss the complaint. It was not dismissed. State Farm expressly refused to identify a date of loss or damage. Nothing prevented it from doing so.

The tolling agreement also provided that suit must be filed no later than one month from the date "State Farm has made an offer to settle the above referenced claim." State Farm has to this date never made an offer to settle this claim, although it sent an unsolicited partial payment to Smyth without requesting a release. <u>Smyth Decl.</u> ¶ 8; Dep. of Jeffrey Smyth, at 96:4-97:18 (dated

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 4
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA 98121
206-441-4110 (Tel)
206-441-4220 (Fax)

Aug. 17, 2005), attached as **Exh. 1** to <u>Osborn Decl.</u> Indeed, Smyth's claim was not formally rejected by State Farm until this motion was filed.

Because the tolling agreement cannot be construed as meaningless, <u>Mercer Place Condominium Ass'n v. State Farm Fire & Casualty</u>, 104 Wn. App. 597, 602-603 (2001)[4], its ambiguous requirement that "suit must be filed" (suit had already been properly and timely filed) within 18 months was merely a paraphrase of the policy language;[5] what the parties actually intended to do and what they did was toll the time limit for *service* of the complaint on the Insurance Commissioner. <u>Osborn Decl.</u> ¶ 3. Smyth's counsel relied on this reasonable assumption. *Id.* Had State Farm intended otherwise, it could have required Smyth to dismiss his complaint voluntarily. It did not do so. *Id.*

Investigations on the claim continued in 2004. Smyth's consultant Ralph Allen prepared a comprehensive report which was furnished to State Farm's Perrault. **Exh. E**, at CLM000019, <u>Carlson Decl.</u> On February 26, 2004, Perrault reported to State Farm that he was "preparing a second report that will include input from . . . Ralph Allen." **Exh. F**, at CLM000018, <u>Carlson Decl.</u>

On or about May 24, 2004, State Farm sent an unsolicited payment for $36,368.00 to counsel for Smyth, the amount representing its own estimated cost of repair of the limited portion of the damage (pre-1998) for which State Farm accepted responsibility. No release or other *quid pro quo* was requested of Smyth. **Exh. A**, <u>Smyth Decl.</u> The check identifies the "date of loss" as

---

[4] "Overall, a policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective."

[5] The policy language actually states that the action "must be started" within one year. "Started" is not defined in the policy. The dictionary defines "start" as, "To begin an activity or movement; set out." The American Heritage Dictionary (2nd College ed. 1982). No specific definition may be ascribed to a term in an insurance policy unless the policy sets forth that definition. *See* numerous cases cited *infra*.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 5
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA 98121
206-441-4110 (Tel)
206-441-4220 (Fax)

"October 9, 1998," a date that has no other significance than it was one day <u>before</u> the effective date of the 1998-99 policy. *Id.*

State Farm made out the check to Smyth payable as follows:

"Jeffrey A. Smyth & Betty A. Smyth & Washington Mutual Bank FA, its Successors and/or assigns & Pacific Northwest Bank, its Successors and/or Assigns *& Associates Financial Services, its Successors and/or Assigns*"

*Id.* (emphasis added). Smyth owed no money to an "Associates Financial Services." It was impossible to negotiate the check because of this named co-payee. After much back-and-forth, State Farm was finally persuaded to reissue the check without "Associates Financial Services" – two months later on August 31, 2004. The entire summer construction season was lost as a result of this error. Repair work began on the Smyth home on or about mid-October 2004. <u>Smyth Decl.</u> ¶¶ 8-10.

No further progress on claim settlement was made with State Farm, or communication received, after the fall of 2004. <u>Smyth Decl.</u> at ¶ 11. Smyth learned long after the fact that State Farm had "closed" the claim file on June 10, 2004. *Id.* On April 18, 2005, well within the 18-month tolling period, the complaint in this matter was served on the Insurance Commissioner. State Farm now argues that it gave up nothing meaningful by signing the March 2, 2004, tolling agreement, in return for Smyth's agreement not to serve the Insurance Commissioner: that it preserved all of its arguments regarding the contractual limitations period, plus gained a new argument (late service of process). This position is untenable.

State Farm does <u>not</u> appear to argue however, that the 18 months ran out at some specific time *before* April 18, 2005. In point of fact (1) the commencement date for the 18-month period has never been identified by State Farm, and State Farm refused to identify it in the March 2nd

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 6
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA 98121
206-441-4110 (Tel)
206-441-4220 (Fax)

letter; and (2) no settlement offer was ever made by State Farm triggering the one month limitation period.

### III. Legal Authority and Argument

#### A. Summary Judgment.

Summary judgment is appropriate only when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. Rule 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986). A disputed fact is material to the outcome of the suit if a finding of fact is necessary and relevant to the proceeding. Id.; General Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 980 (Fed. Cir. 1997). As part of this evaluation, the court must view the evidence in the light most favorable to the nonmoving party—here, the plaintiffs. Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1164 (9th Cir. 1998).

#### B. Identification of Issues.

The issues which this motion presents are these:

1.      Was the contractual suit limitation in the Smyth insurance policies modified in any meaningful way by the March 2, 2004, tolling agreement, in return for Smyth's agreement to refrain from serving the Insurance Commissioner?

2.      How was the contractual limitation period modified?

3.      When the tolling agreement was signed, did the parties reach any understanding of what the "date of loss or damage" was, from which date the new limitation period was to run?

4.      Is State Farm equitably estopped from advocating a certain "date of loss or damage" by virtue of its refusal to take a position on it in the tolling agreement?

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 7
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

5.    If there was no understanding as to the date of loss or damage, to what date does the 18-month limitation period relate?

6.    Should ambiguities in the tolling agreement, which State Farm drafted, be construed against it?

7.    Is the only meaningful interpretation of the tolling agreement that the 90 day service requirement be suspended?

8.    Should this motion for summary judgment be denied because of the existence of several genuine issues of material fact?

We submit that the tolling agreement was motivated solely to avoid service on the Insurance Commissioner of the timely filed complaint in this matter.  Because a complaint had already been filed, there was only one thing left to "toll":  the time limit for service of the summons and complaint.  Statutory filing limitations periods can be and frequently are suspended by agreement; there is no reason why statutory service limitations cannot be tolled in the same way.

In the alternative, Smyth contends that State Farm should be equitably estopped from benefitting in any way from ambiguities in the tolling agreement which it drafted.  Any ambiguities as to (1) the date of loss or damage; or (2) what the tolling agreement actually "tolled" should be construed against State Farm.  Moreover, if State Farm believed that the one-year contractual limitation had expired *before* the tolling agreement was signed (*e.g.*, an October 10, 1998 "date of loss"), then State Farm's inducement of Smyth's reliance on that agreement should be sufficient grounds to impose an estoppel.  If State Farm is estopped, then the six year statute of limitations for written contract disputes applies here.  RCW 4.16.040(1).

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 8
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

C.    **Contractual Limitations Periods.**

Smyth agrees with the proposition that contractual limitations on lawsuits may be placed in insurance policies. But if (as here) the one-year contractual limitation period begins to run from the "date of loss or damage," then without knowing that date, or if that date is intentionally obscured, how is one to determine when the limitation period begins to run?  State Farm's motion does not attempt to answer this question.

State Farm has in fact refused to identify a date of loss or damage.  As Mr. Smyth observed in his deposition:

> "Q    [MR. WITTERS]      Now, do you know whether or not you brought suit against State Farm within the reading of the law, within 18 months of the loss or damage, or from within one month of the offer to settle, whichever was sooner?
>
> A    [MR. SMYTH]      Yes, I believe I did. . . . Well, first of all, there's never been an offer of settlement made in this case. . . .  Second of all, the insurance company has, as of this date, never taken a position with respect to when the date of loss or damage was.  If you will look at this [March 2nd] letter, they specifically state that no position is taken for this time as to the date of loss or damage, and no position has ever been taken, to my knowledge. So it's a little bit difficult to assess when this 12 - 18-month period begins to run, given the fact that the person who's protected by this particular clause refuses to commit as to when the date of loss is. . . ."

Smyth Dep., at 96:22-97:17, attached as **Exh. 1** to Osborn Decl.

State Farm now takes the position that the 18-month period ran from the date that the Smyths "discovered the severe structural damage to the residence which is the subject of the claim against State Farm." Motion, at 12, n.7.  This is known as the "manifestation trigger theory." Washington has rejected this theory in cases of hidden decay, as discussed in detail below.  In not one of the "coverage" letters sent by State Farm to Smyth did it state that suit must be filed 18

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 9
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

months from the "date of discovery."  (Copies of the coverage letters are attached **Exh. C,** at CLM000053 - CLM000058; **Exh. G,** at CLM000033; **Exh. I,** at CLM000119; Carlson Decl.

### D.    Date of Loss or Damage.

State Farm's motion glosses over the issue of identifying the date of loss or damage. Instead, State Farm claims that all but a small part of Smyth's hidden decay losses occurred some time *after* October 1998, relying upon its unilateral coverage change in 1998-99.

State Farm states as fact in footnote 5 on page 6 of its brief that in October of 1998 it issued an "Amendatory Collapse Endorsement" to Smyth changing the policy definition of collapse from "substantial structural impairment" to "entire collapse of a building," meaning "actually fallen down or fallen into pieces."  It argues that despite the seriousness and extent of the hidden decay in the Smyth residence (itself a factual question), because nothing has yet "fallen down" there is no coverage post-1998. But as we have shown, there was no Amendatory Collapse Endorsement issued to any Smyth policy. And the amendatory endorsement which is attached to Smyth's 1999 policy (effective Oct. 10, 1998) makes no reference at all to a new, restricted definition of "collapse." **Exh. J,** at POL000261-264, Carlson Decl.

The decision in Ellis Court Apartments Ltd. Partnership v. State Farm, 117 Wn. App. 807 (2003), which presents facts startlingly similar to the facts in the present case, unambiguously rejected State Farm's reliance on the "manifestation trigger theory." The insured, a condominium association, sustained substantial structural impairment losses as a result of hidden decay due to water damage.  It had carried insurance with State Farm continuously from July 14, 1993 through September 1, 1999. *Id.* at 809. As here, the policies in question covered collapse caused by hidden decay.  In July 1998, State Farm restricted the definition of collapse by issuing Ellis Court an

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 10

C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

Amendatory Collapse Endorsement thereby eliminating coverage unless the structure first falls to the ground. *Id.* Because State Farm could not prove it served an Amendatory Collapse Endorsement on Ellis Court (as is the case here), it stipulated that the restrictive definition of collapse would not apply. *Id.*

State Farm argued in *Ellis Court* that the trigger date of loss or damage for purposes of policy coverage should be determined by using the manifestation trigger theory, *i.e.*, what is "the date on which you were aware of damage from decay such that a claim was or should have been submitted?" *Id.* at 813. In *Ellis Court*, that date fell after the 1999 policy ended. State Farm rejected the coverage claim on this basis. In the ensuing declaratory judgment action, Ellis Court argued that the triggering event should have been determined by using the "injury-in-fact" test, *i.e.*, that the date of loss should be "the point in time when decay or rot first causes substantial structural impairment." *Id.* at 813. The trial court agreed and granted Ellis Court's motion for summary judgment. The court of appeals affirmed:

> "The policy here contains no language purporting to condition, limit, or connect the commencement of property loss or damage to when that damage was discovered . . . . The record contains no extrinsic evidence that the policy should be construed to mean that damage commences when it is discovered. We therefore interpret the provision in favor of the insured, and find that 'commence' refers to the time the damage first began, not to when it was discovered."

117 Wn. App. at 814.

Ralph Allen describes in his reports and deposition several aspects of the Smyth home which have reached a state of substantial structural impairment due to hidden decay. Allen deposition, 45:10-18 and **Exh. 8**; 50:10-51:14 and **Exh. 9**, and *see, e.g.*, Deposition of Ralph Allen, at 64:22-65:22; 69:14-21; 70:8-71:20 (dated Sept.15, 2005), all attached as **Exhibit 2** to Osborn

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 11
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

1  Decl. Smyth hereby moves to publish this deposition *in toto*. State Farm arbitrarily limited its

2  coverage of these losses to those which it says reached a state of structural impairment *before*

3

4  October 10, 1998, when the policy language supposedly changed.  State Farm has refused to pay

5  the costs for any other substantial impairment, and it has likewise refused to pay the reasonable cost

6  of performing and repairing necessary and significant destructive testing and investigation which

7

8  was performed to identify the losses. Smyth Dep., at 107:8-108:16, attached as **Exh. 1** to Osborn

9  Decl. It has breached its contract by making these coverage determinations and by failing to make

10  payment to Smyth.

11          **E.     Collapse**

12

13              **1.     Notice of Change in Policy Coverage**

14          An Amendatory Collapse Endorsement was never provided to Mr. Smyth.  The Smyth's

15  policies from 1996 to the present are attached to the Declaration of Carlson on file herein as

16  **Exhibit J**, at POL000173 to POL000445.  There is no Amendatory Collapse Endorsement.  Yet,

17

18  State Farm changed the definition of "collapse" substantially in October of 1998.  Smyth had no

19  advance notice of this change.  Smyth Decl. ¶ 13.

20          The seminal decision in McGreevy v. Oregon Mutual Ins. Co., 74 Wn. App. 858 (1994),

21

22  controls:

23          "Following the issuance of the policy here, Oregon Mutual attempted to unilaterally
            amend it to take advantage of changes in the law which authorized the prohibition
24          of stacking. But this required a change in the contract of insurance which, in turn,
            required a meeting of the minds and agreement. Notice and agreement must be
25          obtained before amendments or modifications to insurance policies can be made by
26          the insurer. Orsi v. Aetna Ins. Co., 41 Wn. App. 233, 240, 703 P.2d 1053
            (1985)(before a policy can be modified, there must be an actual agreement or
27          understanding that the policy will be or is modified)(relying on Grand Lodge of
28          Scandinavian Fraternity of Am., Dist. 7 v. United States Fid. & Guar. Co., 2 Wn.2d

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA 98121
206-441-4110 (Tel)
206-441-4220 (Fax)

561, 572, 98 P.2d 971 (1940)(in order to modify the bond, there must be an agreement to modify, supported by consideration)).   Oregon Mutual's position would extend the rule in Webster to include endorsements or amendments to an insurance contract. Such an extension, however, would eliminate the need to notify insureds of amendments and would allow an insurer to deny coverage or benefits without the knowledge or consent of the insured. . . . .We disagree that the average policyholder would be put on notice of a substantial change -- the loss of stacking -- by the notation at the bottom of a declaration sheet -- 'OMG-24'. <u>Without receipt of the actual endorsement, which the jury concluded she did not receive, the notation would not have been meaningful.</u>"

*Id.* at 867-68 (emphasis added).

For 15 straight years, Smyth insured his home with State Farm.  For 8 years, the terms remained essentially the same.  Then, suddenly, in October 1998 the definition of coverage changed dramatically.  Smyth, not surprisingly, remained wholly unaware of the change until the present dispute arose.  <u>Smyth Decl.</u> ¶ 13.

It does not impose an impermissible burden on the insurer to require it to prove that it properly notified its insurer of a change in coverage.  The court in *McGreevy* observed:

"Oregon Mutual made a business decision not to maintain records of specific mailings of significant changes in policy coverage.  It could have had each insured sign a copy of the amendment and return it to an insurance agent verifying that they received and understood the changes; the notice could have been mailed certified or registered – any of which would have provided evidence of notice. . . . [I]ncreased costs would not excuse an obligation to notify an insured of significant changes in coverage.  Presumably, the cost to keep such records exceeds the cost of providing for coverage it hoped to avoid when an insured is not notified of a change."

<u>McGreevy</u>, 74 Wn. App. at 869.

Ironically, the insurer also argued that the increase in premiums should have put the insureds on notice that a change had been made to the existing policy.  The court will recall that Smyth's premiums increased 50% between 1998 and 1999.  The court said, "An increase in

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 13
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

premiums is not adequate notice; premiums increase for any number of reasons, including the purchase of new vehicles, increases in coverage, or increases in the insurer's cost of business." *Id.* One is left to wonder, moreover, how an *increase* in premiums would signal a significant limitation, as opposed to expansion, of coverage.

RCW 48.18.2901 states in part as follows:

"(2)    Any insurer failing to include in the [renewal] notice required by subsection (1)(b) of this section the amount of any increased premium resulting from a change of rates <u>and an explanation of any change in the contract provisions</u> shall renew the policy if so required by that subsection according to the rates and contract provisions applicable to the expiring policy." [Emphasis added].

A twenty day notice of such changes is required. RCW 48.18.2901(1)(b) & (2). No such notice was sent to Smyth. *Ever.* As such, the 1999 - 2005 policies have been renewed "according to the . . . contract provisions applicable to the expiring policy," *i.e.*, the 1997-1998 policy. RCW 48.18.2901(2). This requirement is reflected in the Washington Administrative Code as well:

"It is unfair practice to utilize a twenty-day notice to . . . change the terms of a policy to the adverse interest of the insured thereunder, except on a one time basis in connection with the renewal of a policy as permitted by RCW 48.18.2901(2), or to utilize such notice if it . . . does not provide sufficient information to enable the insured to understand the basic nature of any change in terms . . . ."

WAC 284-30-590(1). In determining which collapse definition to use, therefore, the 1999 changed definition limiting coverage to actual falling down or falling apart must be disregarded entirely, for all of Smyth's policies to date, and the 1998 policy language should be deemed applicable to this lawsuit.

## 2.    <u>Defining "Collapse"</u>

"Collapse" is a liberally construed concept in insurance circles. In <u>Mercer Place Condominium Ass'n v. State Farm Fire & Cas.</u>, 104 Wn. App. 597 (2001), State Farm conceded

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 14
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

that the word "collapse" as used in Mercer Place's policy means "substantial impairment of structural integrity," so the court found no need to construe the term.  The court did observe that a "growing number of jurisdictions have assigned the more liberal standard, 'substantial impairment of structural integrity,' to the use of 'collapse' in insurance policies, as opposed to the minority view, which requires that the structure actually fall down." *Id.* at 629.  The court also noted that "Judge Barbara Rothstein predicted that the Washington Supreme Court, if called upon to interpret a collapse provision in an insurance policy, would adopt the majority 'substantial impairment' standard." *Id.* (citing Allstate Ins. Co. v. Forest Lynn Homeowners Ass'n, 892 F. Supp. 1310, 1314 (W.D. Wash. 1995)(opinion withdrawn by 914 F. Supp. 408 (W.D. Wash. 1996))).

In Assurance Co. v. Wall & Assocs., 379 F.3d 557 (9th Cir. 2004), the court of appeals reversed a summary judgment entered in favor of an insurer where the court defined "collapse" narrowly to require a sudden collapse.  The court's reasoning tracked *Mercer* and *Allstate* decisions closely, concluding that substantial loss of structural integrity, rather than actual falling down, is the appropriate definition of collapse:

> "[Such interpretation avoids] the unreasonable result of requiring an insured seeking the benefits of its insurance coverage to neglect repairs and allow a building to fall, a course of action which could not possibly comport with the expectation and intent of the insured, or advance the best interests of the insurer, the public or even the insurer . . . ."

*Id.* at 562.

In Buczek v. Continental Cas. Ins. Co., 378 F.3d 284, 290 (3d Cir. 2004), the court applied New Jersey law to an insurance coverage dispute involving pilings damaged by hidden decay.  The court noted that collapse coverage in New Jersey includes a collapse which has not yet occurred

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 15
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

but is "imminent." This was based on the New Jersey opinion in <u>Fantis Foods, Inc. v. North River Ins. Co.</u>, 753 A.2d 176, 183 (N.J. Super. Ct. App. Div. 2000), wherein the court decided that the definition of collapse "must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by."

In <u>Beach v. Middlesex Mutual Assurance Co.</u>, 205 Conn. 246, 532 A.2d 1297 (Conn. 1987), the issue was whether there was a latent ambiguity in the term "collapse." The court found that there was and defined "collapse" as follows:

> "Although 'collapse' encompasses a catastrophic breakdown, as the defendant argues, it also includes a breakdown or loss of structural strength, as the plaintiffs maintain. If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended."

> * * * *

> The result that we reach finds support in the reasoning of other courts. Although the judicial decisions elsewhere are divided, the more persuasive authorities hold that the term 'collapse' is sufficiently ambiguous to include coverage for <u>any substantial impairment of the structural integrity of a building</u>." The cases that hold to the contrary, which hold that 'collapse' unmistakably connotes a sudden falling in, loss of shape, or flattening into a mass of rubble, have come to be in the distinct minority.

<u>Id.</u> at 251-53 (emphasis added)(citations omitted). The court affirmed the trial court's decision premised on a cracked foundation wall, separated wooden support beams, and a cracked concrete patio floor. The plaintiffs lived in their house at all times including during the period that the structural repairs were completed. There was testimony that the house would have caved in had the plaintiffs not acted to repair the damage. <u>Id.</u> at 248-49.

In <u>Nationwide Mutual Fire Ins. Co. v. Tomlin</u>, 352 S.E.2d 612 (Ga. App. 1986), cracks in exterior brick walls which were being pulled away from the house were caused by a decaying tree trunk under the foundation.  The insurance company refused to provide coverage for "collapse."  The policy at issue provided insurance for "collapse of a building or any part thereof." *Id.* at 613-14.  The court looked at the policy as a whole to determine if any ambiguity existed as to the term "collapse" and found that it was not clearly defined in the policy.

The court discussed the different court views of the definition of "collapse" and adopted the definition expressed in <u>Gov't Employees Ins. Co. v. DeJames</u>, 261 A.2d 747, 751 (Md. 1970):

> "A contrary view is expressed in <u>Gov't. Employees Ins. Co. v. DeJames</u>, <u>supra</u> at 751, which defines 'collapse' as 'any serious impairment of structural integrity.'  Because that interpretation more realistically reflects the purposes of the policy, we adopt it as our own.  In applying this test to the facts of this case, we conclude, as did the trial court, that the condition is covered under the policy.  We further refine the definition in <u>Gov't. Employees Ins. Co.</u> and announce that in this state, when 'collapse' is not otherwise defined in an insurance policy, it shall be deemed as having occurred when there is <u>a reasonably detectable serious impairment of structural integrity</u>."

<u>Tomlin</u>, 352 S.E.2d at 615 (emphasis added).  The court went on to reject the insurance company's insistence on a 'plain meaning' approach:

> "We are unpersuaded by appellant's position, since each of the cases cited is distinguishable: in <u>Higgins v. Conn. Fire Ins. Co.</u>, <u>supra</u>, there was no worsening of the condition as here.  <u>Olmstead v. Lumberman's Mut. Ins. Co.</u>, <u>supra</u>; and <u>Stewart v. Preferred Fire Ins. Co.</u>, 206 Kan. 247, 477 P.2d 966 (1970), were 'named peril' policies as opposed to 'all risk' policies.  <u>LaSalle Nat. Bank v. American Ins. Co.</u>, 14 Ill. App. 3d 1027, 303 N.E.2d 770 (1973), dealt with an inherent rather than extraneous cause of collapse.  <u>New Zealand Ins. Co. v. Lenoff</u>, 315 F.2d 95 (9th Cir. 1963), dealt exclusively with the meaning of 'settling' rather than 'collapse.'  <u>Graffeo v. U.S. Fidelity & Co.</u>, <u>supra</u>, followed the prior decisions of the New York court, which required an element of suddenness.  There is no such requirement in Georgia.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 17
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

We are more inclined to follow the lead of <u>Great Eastern Cas. Co. v. Blackwelder</u>, 21 Ga. App. 586, 94 S.E. 843 (1917), one of the earliest decisions in this state. In <u>Great Eastern</u>, in interpreting the meaning of the word 'building,' the court also mentioned 'collapsed.' In finding the insurance company liable, it held that in a contract of adhesion where the language is susceptible to two or more meanings, the meaning more favorable to the insured is to be preferred if it can be done without doing violence to the contract. <u>Great Eastern</u>, at 592, states: 'It is not necessary for the plaintiff's recovery to show that the entire building collapsed."

<u>Id.</u> Finally, the court noted that to hold otherwise would be economically wasteful, a theme or

basis for the definition present in many other opinions as well. <u>Id.</u> at 416.

In <u>Indiana Ins. Co. v. Liaskos</u>, 297 Ill. App.3d 569, 697 N.E.2d 398 (1998), the court

adopted an even broader definition for the term "collapse" after reviewing a multitude of court

opinions analyzing the term "collapse."

"It is clear from these cases that under the majority view the term 'collapse' does not require complete destruction or falling in of the building or a part thereof nor would it require that the loss result from a sudden catastrophic occurrence. <u>Beach</u>, 205 Conn. 246, 532 A.2d 1297. A collapse will be deemed to have occurred where a falling is imminent (<u>e.g.</u>, <u>Whispering Creek Condominium Owner Ass'n</u>, 774 P.2d 176) or where there is any substantial impairment of the structural integrity of the building (<u>e.g.</u>, <u>Mitchell</u>, 503 So.2d 870; <u>Beach</u>, 205 Conn. 246, 532 A.2d 1297). <u>Thornewell</u>, 33 Wis.2d 344, 147 N.E.2d 317.

At this juncture, we note our preference for the majority view rather than the narrow interpretation given by the courts in <u>La Salle National Bank</u> and <u>Rubenstein</u>. We are impressed with the fact that substantial impairment to the structural integrity of a building comes within the dictionary definition of the term 'collapse' and should be sufficient to trigger coverage under the term 'collapse." To require a complete falling in of a structure gives undue ascendancy to semantic casuistry. Moreover, given the fact that the dictionary definition of 'collapse' makes both parties' interpretations of the term 'collapse' reasonable, we as the court in <u>Beach</u>, find it necessary to adopt the broader definition under the rule of construction that ambiguous policy terms are to be construed against the drafter and in favor of the insured."

<u>Id.</u> at 578.

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA 98121
206-441-4110 (Tel)
206-441-4220 (Fax)

1       Although the court ultimately affirmed the lower court's decision that the Liaskos did not

2   have coverage, the court's reasoning is instructive here. The damage experienced at the Liasko

3
4   home appeared to be caused by increased water pressure from a city sewer system that over-

5   stressed the plumbing, causing the slab in the basement to crack and be pushed up along with

6   cracks in a foundation wall, doors and passageways on the first floor and in the exterior masonry

7
8   adjacent to the front door. Neither testifying expert during the bench trial concluded that the

9   structural foundation was unsound or that there was a breakdown or loss of structural strength in

10  the Liaskos's home.

11      "The evidence did not show that the basement foundation wall had moved and
12      separated from the   rest of the foundation, that it was no longer supporting
13      Liaskos's home or that its movement caused Liaskos's home to be uninhabitable.
        See Thornwell, 33 Wis.2d 344, 147 N.E.2d 317 (applying majority view but finding
14      that bulge in basement wall did not materially impair basic structure or substantial
15      integrity; wall could perform its structural function). This is to be contrasted with
        the facts in Campbell, 682 A.2d 933, wherein the basement foundation wall
16      crumbled causing the house to shift, the floors to be come unlevel and the house to
        become uninhabitable; in Whispering Creek Condominium Owner Ass'n, 744 P.2d
17      176, wherein the ceiling joists had deteriorated and the roof was in immediate
18      danger of collapse; in Beach, 205 Conn. 246, 532 A.2d 1297, where the basement
        foundation was no longer supporting the house and where the house eventually
19      would have fallen into the basement; and in Mitchell, 503 So.2d 870, where the
20      staircase had separated from the primary walls, the main body of support was
        damaged and parts of the house could not support the weight of a person."

21
22  Id. at 579. Liaskos' facts are easily distinguishable from the Smyth's. Here, Ralph Allen has

23  testified that in his view the identified damage was in fact defined by its inability to carry a

24  requisite load or to support a structure. Allen deposition at 65:15-22; 69:14-70:2; 70:8-71:20,

25  attached as **Exhibit 2** to the Osborn Decl.

26
27      In Guyther v. Nationwide Mutual Fire Ins. Co., 428 S.E.2d 238 (N.C. App. 1993), a house

28  after a heavy snowfall, experienced a noticeable "dip" in part of the roof while the second floor of

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 19
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

the house dropped by two to three inches. *Id.* at 240. The insurance policy at issue included

language nearly identical to the Smyth's 1998 policy:

> "We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
>
> * * *
>
> b. hidden decay
>
> * * *
>
> Collapse does not include settling, cracking, shrinking, bulging or expansion."

*Id.* The insurance company argued that the policy required total destruction of the structure. The

court did not adopt that definition finding the term ambiguous:

> "Among the accepted definitions of 'collapse' is 'to break down completely; fall apart in confused disorganization; crumble into insignificance or nothingness." *Webster's Third New International Dictionary* 443 (1966). Another accepted definition is "to suddenly lose force . . . effectiveness, or worth." *Id.* Although both these definitions encompass the total destruction of a structure, the second definition can include less than total destruction. A building has lost is 'effectiveness' or 'worth' when its basic structure or integrity is materially impaired. Accordingly, in giving the ambiguous term the reasonable definition which favors the Guythers, the term 'collapse' includes the sudden material impairment of the basic structure or integrity of a building which remains standing.
> . . .
>
> Nationwide contends that the above definition of the term 'collapse' is in direct conflict with the provision of the policy which provides that collapse does not include 'settling, cracking, shrinking, bulging or expansion.' We do not agree. The policy purports to provide coverage for collapse, and may be reasonably read to exclude coverage for 'settling, cracking, shrinking, bulging or expansion' only when they do not suddenly and materially impair the structure or integrity of the building."

*Id.* at 241-42 (emphasis added).

The court then found that evidence of impairment was properly submitted to the jury:

"The record reflects the following evidence on the condition of the house: part of the house 'was dropped, considerable' and one of the doors of the house would not open; the floor had fallen away from the baseboards in some sections of the house and the floor was so uneven that 'you actually had to walk downhill in the hall;' the ceiling in the downstairs area of the house was bowed and 'the exterior portion of the [roof] had started to push down and out instead of being just a straight flat roof;' the changes in the house on 1 April 1998, occurred suddenly; the kitchen cabinets had pulled away from the wall and the upstairs floor had dropped to the extent that 'it's just like a step-off from the balcony to the hall; . . . .'"

*Id.* at 242.  Similarly, here the evidence shows that the Smyth home suffers from most of the same maladies as described in this case, all of which fell under the rubric of "collapse."

Campbell v. Norfolk & Dedham Mutual, 682 A.2d 933 (R.I. 1996), involved damage to a house including some crumbling of the foundation, unlevel floors, which eventually rendered the home uninhabitable.  The insurance company refused coverage because the policy provided the same language as in the Smyth's policy:

"We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

* * *

b. hidden decay

* * *

Collapse does not include settling, cracking, shrinking, bulging or expansion."

*Id.* at 935.  The appellate court reversed a summary judgment in favor of the insurer:

"Here, plaintiffs do not contend that the basement wall settled, cracked, or bulged, or expanded, but that a large part of it crumbled into a pile of rubble. Consequently, the motion justice erred when she concluded that '[s]ince the damage to plaintiffs' home consists of cracked walls and unleveled floors, the requisite 'collapse' of the building has not occurred.'"

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 21
C:\WPJeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

*Id.* As part of its evaluation of the motion justice's decision, the reviewing court discussed the definition of 'collapse:'

> "The issue, then, becomes whether it is reasonable for the purchaser of an insurance contract to believe that the collapse of a nineteen-foot section of a thirty-two-foot basement wall that eventually renders this home inhabitable constitutes a 'collapse of building.' This court has never defined these terms, and both parties sharply dispute their meaning.
>
> In construing insurance clauses similar to the one here, many courts have found that use of the word 'collapse' in an insurance policy does not require the total destruction of a building because to require a party to await complete destruction before losses will be covered frustrates an insured's understanding of the insurance agreement and subverts his or her duty to mitigate damages to avoid economic waste."

*Id.* at 936 (emphasis added)(citations omitted). The court thus found the term "collapse" to be ambiguous and remanded the case to the superior court for further proceedings.

Part of the substantially failed structure of the Smyth residence is a rotting untreated beam running along the north side of the home. Allen deposition at **Exh. 8**, p.3, attached as **Exh. 2** to Osborn Decl. According to Mr. Allen's deposition, this beam does not meet code requirements for load bearing strength, and it is on its way to complete failure. *Id.* Smyth cannot be forced to await the utter destruction of his home by abiding the time when the beam reaches a state of complete dilapidation. Yet State Farm has taken the untenable position that he must do so. It is a guarantee, moreover, that State Farm will either cancel Mr. Smyth's coverage or will send the necessary amendatory collapse endorsement now, thereby eliminating this protection *in futuro*. This is unfair and violative of the insurance agreement.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 22

C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

1

2

3   **E.    Increase in Chance of Loss.**

4        State Farm accuses Smyth of failing to maintain the residence enough, thus increasing the

5   risk of substantial structural impairment ("collapse").  This, of course, is a factual question at

6   foundation, and Mr. Smyth's testimony creates a genuine and material factual issue.  He has

7   testified that apparently some or all of the sealant failed early in the 1990s, but that he did not

8   notice any change.  Smyth Decl. at ¶ 13.  He believes that he would have noticed any significant

9   change.  *Id.*  Only recently, when he began to investigate the decay, was it brought to his attention

10  that gaps in the caulking were a potential cause of water intrusion.  *Id.*  Nor did or could he see

11  gaps in the flashing.  *Id.* According to Smyth, he does not possess the requisite skill or experience

12  in construction technology to judge whether flashing is done right or wrong. Smyth Dep., at 36:4-

13  39:6, **Exh. 1** to Osborn Decl..

14

15       The *Ellis Court* decision also addresses the increased chance of loss argument, and affirmed

16  the dismissal on summary judgment of this defense:

17

18      "The 'knowledge or control' provision of the policy at issue states: 'We will not
        pay for loss while the chance of loss *is increased* by any means within your
19      knowledge or control.'  State Farm argues that factual issues preclude summary
        judgment as to this defense.  We disagree.  State Farm argues that 'where, as here,
20      a building owner has allowed water intrusion into the premises to continue until a
        collapse state is reached, there can be no question that State Farm's chance of loss
21      has been substantially increased.'  State Farm maintains that testimony from
        inspectors and carpenters familiar with the building's problems provide evidence
22      that Ellis Court increased its chance of loss.  The testimony by inspectors and
        carpenters is evidence that water leakage had occurred, but it is not evidence that
23      Ellis Court increased the chance of loss.  The essence of State Farm's argument is
        that because Ellis Court did not do more, and sooner, to remedy the water leakage
24      problem, it failed to decrease its loss.  But failure to decrease a loss is not the same
        as increasing a loss . . . ."
25

26

27  Ellis Court Apartments L.P. v. State Farm, 117 Wn. App. 807, 817 (2003) (emphasis added).

28

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

1
2
3
4
5
6
7

State Farm argues, in essence, that Smyth should have done more to prevent the intrusion of water into his home over the years.  But as with *Ellis Court*, this proves at most that Smyth failed to *decrease* his loss, which is not the same as "increasing" a loss.  In any case, it is State Farm's burden to prove that Smyth actually increased the chance of loss and thus violated his policy.  It is not Smyth's burden on summary judgment or at trial to prove the opposite.

8

### G.    Bad Faith.

9
10
11
12
13
14
15

State Farm has also asked that the Washington Consumer Protection Act claim be dismissed.  It argues that State Farm has not violated any duty or acted improperly with respect to this claim.  Filed herewith is the Declaration of Richard B. Kilpatrick (dated October 3, 2005), attaching his findings respecting the improper handling of this claim by State Farm.  His testimony raises significant factual issues supporting Smyth's claim of bad faith.  Space limitations do not allow further discussion of his opinions here.

16
17

### Conclusion

18
19
20
21
22

This brief should be read in tandem with Smyth's cross-motion for summary judgment, which motion has been filed herewith.  For the same reasons that State Farm's motion for summary judgment dismissal must be denied, Smyth's motion for partial summary judgment dismissing State Farm's affirmative defenses should be granted.

23

Dated this 3rd day of October, 2005.

24
25

OSBORN•MACHLER, PLLC

26
27
28

By    /s/ Simeon J. Osborn
        Simeon J. Osborn, WSBA #14484
        Attorneys for Plaintiff

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 24

C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of October, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Timothy J. Whitter, WSBA #08660    Email: twhitters@gth-law.com
> Bradley G. Davis, WSBA #20764    Email:   bdavis@gth-law.com
> Michelle A. Menely, WSBA #28353    Email: mmenely@gth-law.com
> Gordon Thomas Honeywell
>    Malanca Peterson & Daheim, PLLC
> 600 University Street, Suite 2100
> Seattle, WA   98101-4185
> Telephone:    (206) 676-7500
> Facsimile:     (206) 676-7575

Attorneys for Defendant State Farm Fire & Casualty Co.

DATED at Seattle, Washington this 3rd day of October, 2005.

> /s/ Alison Forrest
> Alison Forrest, Legal Assistant
> Osborn Machler
> 2125 Fifth Avenue
> Seattle, WA   98121
> Telephone:    (206) 441-4110
> Facsimile:     (206) 441-4220
> Email:       Aforrest@osbornmachler.com

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF DISMISSAL - 25
C:\WP\Jeff's Cases (Active)\Smyth-State Farm\pleadings\Response to Defendant's Motion for SJ of Dismissal.wpd

**OSBORN MACHLER**
2125 Fifth Avenue
Seattle, WA  98121
206-441-4110 (Tel)
206-441-4220 (Fax)